UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID EARL BALFOUR,

                            Petitioner,                    Case Number 2:05-CV-72189
                                                           Honorable Denise Page Hood

v.

BLAINE C. LAFLER,

                            Respondent.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE
PETITION FOR A WRIT OF HABEAS CORPUS
AND
ORDER CONDITIONALLY GRANTING WRIT OF HABEAS CORPUS**

This matter is before the Court on Petitioner David Lee Balfour's petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Lapeer Circuit Court of first-degree premeditated murder, MICH. COMP. LAWS § 750.316, arson of a dwelling house, MICH. COMP. LAWS § 750.72, and insurance fraud. MICH. COMP. LAWS § 750.451. As a result of these convictions, Petitioner was sentenced to concurrent terms of non-parolable life for the murder, three-to-twenty years for the arson, and one-to-four years for insurance fraud. The petition raises three claims: (1) the prosecutor committed misconduct by not informing the trial court about the presence of a potentially biased juror, intimidating a witness, and presenting perjured testimony; (2) the evidence was insufficient to sustain Petitioner's murder conviction because the victim died of natural causes and not as a result of Petitioner's conduct; and (3) the trial court erroneously admitted the victim's prior statements, irrelevant evidence related to a second fire, and a gruesome autopsy photograph. The Court finds that the state court's

adjudication of Petitioner's claim that the prosecutor committed misconduct by failing to disclose the presence of a potentially biased juror was contrary to, or involved an unreasonable application of, clearly established Supreme Court law. The Court finds that Petitioner's other claims are without merit. The Court will therefore grant the petition for writ of habeas corpus conditioned on the state trial court holding an evidentiary hearing to determine whether the juror in question was, in fact, biased.

## I. Facts and Procedural History

Petitioner and his wife, Beverly, lived on a farm in rural Lapeer County, Michigan. Petitioner operated the farm, and the victim and her granddaughter operated a daycare center in the house. In the early morning hours of February 14, 1999, Valentine's Day, there was a fire that destroyed the house. The victim's body, consumed from the knees down by the fire, was found lying on her bed. Petitioner said he was doing his morning chores in a near-by pole born when the fire occurred.

Suspicion was immediately drawn to Petitioner, whose demeanor following his wife's death could, at best, be described as indifferent. Fire investigators found what they believed to be evidence of accelerants near the location of the body. An autopsy showed the presence of morphine in the victim's system. Further investigation disclosed that the victim had told people she was afraid Petitioner was planning to kill her and that they were in the process of getting a divorce. Other individuals informed police of incriminating statements Petitioner made after the fire. As a result, Petitioner was charged and tried of the offenses described above.

At trial, the evidence showed that 9-1-1 calls came in regarding the fire at 6:42 a.m. When the fire department arrived, the fire was too intense for firefighters to go inside and

retrieve the victim. One firefighter could see through a window that her body was lying on the bed, and he could see her exposed femurs glowing from the heat. It took several hours to extinguish the fire. Immediately afterwards, investigators started removing debris and began the process of determining the cause and origin of the fire. They determined from burn patterns that the fire originated in the bedroom, and that it was deliberately set by use of a flammable liquid. The victim's car was unusually parked within a foot of the side of the house, suggesting it was placed there intentionally to be destroyed in the fire. Petitioner's gravel truck was also parked in front of the house, screening it from view from the street.

Firefighters testified that they stayed at the scene to ensure that no hot spots remained that might flare up into another fire.  Nevertheless, they had to respond to a second fire at the Balfour residence that night.  Investigators determined that this second fire was also intentionally set with an ignitable liquid.  Another fire investigator hired by an insurance company likewise examined the remains of the home and determined that both fires were deliberately set by using a flammable liquid.  A Michigan State Police chemist found the presence of a light petroleum product, such as lighter fluid, on a sample taken from the house. He also found evidence of a heavy petroleum product, such as kerosene, on other samples.

Several witnesses testified that the victim had been scared of Petitioner in the months before the fire.  She went to the local state police post and spoke with a trooper in late January or early February of 1999. She told the trooper that she had been assaulted by Petitioner several times and was in the process of getting a divorce. She told him that a few days previously, Petitioner had entered the house with a shotgun and she was scared by the look on his face.  She was reluctant to have the trooper investigate because

Petitioner had told her that he would kill her if she went to the police again. As she left the post she told the trooper that if she ended up dead, it was because Petitioner had killed her.  Not long after this encounter, the trooper heard that she had died in a fire.

One of Beverly's friends testified that she spoke several times with the victim on the phone in the days leading up to the fire.  The victim told her that she thought Petitioner was going to kill her, and that the victim told her that she had overheard him tell his brother so during a phone conversation. The victim told her friend that if she died, she would know who killed her.  A local police chief testified that the victim called him in October 1998 and told him that she feared Petitioner. He advised her to call the state police because she lived outside his jurisdiction.

Another man, Gregory VanCamp, testified that he went to buy cattle from Petitioner in October of 1998.  He was talking to Petitioner in the driveway when he heard his wife yell something at Petitioner from inside the house.  Petitioner yelled back and said that he would kill her before she got everything he owned in a divorce. The exchange struck VanCamp enough that he tried to convince Petitioner that it wasn't worth it, and that he would retain half of his property. Petitioner replied that he did not want to lose anything he had worked so hard for.

Several witnesses also testified to Petitioner's behavior and statements on the day of the fire.  Petitioner claimed that when he saw the fire, he ran into the house to save the victim, but he was forced out by the heat and thick smoke.  However, Petitioner was seen that morning with light burns on his face but not the rest of his head or neck. This suggested to investigators that he burnt his face from the flash when he ignited the liquids. They thought that the burns were inconsistent with the all-around burning one would see

-4-

if someone had entered a house during an active fire.

Petitioner said he was in the pole barn doing chores when the fire started. He said he heard the dog barking but did not see the fire. He was alerted to the fire by a neighbor who ran onto his property.  Another neighbor, who saw the fire from about a half-mile away was the first one to call 9-1-1.

After the fire, neighbors volunteered to perform the chores that still needed to be completed on the working farm. The victim's step-son testified that when he went into the pole barn on the day of the fire, he could tell that no chores had been performed yet that day, contrary to Petitioner's claim. The victim's granddaughter testified that Petitioner never got up that early to perform chores, in any event.

Other witnesses heard Petitioner make inappropriate remarks immediately after the fire. One firefighter testified that as the victim's body was being placed into a body bag, he heard Petitioner, who was standing on the perimeter of the house, say "fuck that bitch." Another one heard Petitioner say that he was surprised at how much of the structure remained, and that he thought the first floor would have fallen into the basement.

Petitioner's granddaughter, who worked with the victim in the daycare and was very close with her, testified that the summer after the fire she ran into Petitioner outside a grocery store.  She yelled at him: "She's haunting the shit out of you, isn't she?" Petitioner replied: "I never should have done it."  She gave him "the finger" and drove away. She also testified against him regarding items he listed in an inventory and submitted to the insurance company.

Four jail-house informants testified to incriminating statements Petitioner made in jail.  One testified that he overheard a telephone conversation outside his cell. He heard

Petitioner say over the phone, "You and I both know that I did it and they can't prove any of it.  As long as I have you on my side, then they don't' have anything.  Are you sure I can count on you not to tell the truth?"  Another prisoner testified that he overheard Petitioner tell an inmate that he used morphine, he checked to see that the victim was not breathing, and then he put a newspaper over a light and left. A third inmate testified that Petitioner told him that the police would never find evidence of accelerants because ether evaporates, and he used morphine. The final informant testified that Petitioner told him he used an extension cord to make it look like an electrical fire, he gave the victim enough morphine to "kill a cow," he opened the bedroom window to feed oxygen to the fire, and the whole thing was a big insurance scam.  All four of the witnesses testified that either they did not like Petitioner or expected consideration from the prosecutor in exchange for their cooperation.

Investigators who spoke with Petitioner testified to other statements he made. Petitioner explained to one that on the evening before the fire, the victim asked him to bring a can of ether into her bedroom for her to use on cold sores. He told a fire marshal that they might find two cans of ether in the bedroom that the victim used for cold sores.  He told another detective that they might find morphine in the body because she "voluntarily" drank a mixture of Sprite, Kessler's and morphine before going to bed.[1]

Expert witnesses gave diametrically opposed opinions at trial regarding the lethality

---

[1]The parties essentially agreed that there was a bottle of liquid morphine (20 mg/ml) in the house that was obtained from a family friend who was suffering from cancer. There was disagreement, however, on whether Petitioner used it for his bad back or the victim used it for her ailments.  A pharmacist testifying for the prosecutor explained that the liquid morphine would have been pinkish in color and would have had a citrus taste that could be masked by citrus-flavored soda.

of the amount of morphine found in the victim's body. The pathologist who performed the autopsy, Dr. Kanu Virani, detected 240 ng/ml of morphine in her body. He testified that 100 ng/ml was a toxic dose, and that anything over 200 ng/ml was a lethal dose. A pharmacist who testified for the prosecution agreed that 240 ng/ml was a lethal dose.

In sharp contrast, Dr. Werner Spitz testified for the defense that 400-500 ng/ml was a toxic dose, and that 600-650 ng/ml was lethal. Another expert for the defense, Dr. Richard Rech, Professor of Pharmacology and Toxicology at Michigan State University, testified that given the victim's age and weight a lethal dose would be 600-700 ng/ml. In fact, Dr. Rech testified that a patient suffering from a heart attack given a 10 mg dose of morphine in an emergency room would have a level of 200-400 ng/ml.[2]

There was also diametrically opposed expert opinions regarding whether the victim died as the result of a heart attack. Dr. Virani testified that his autopsy revealed a 90% blockage of the left anterior descending artery into the heart. He opined, however, that because there were three other arteries serving this area, the victim did not die as the result of a heart attack. Dr. Spitz, however, believed that the victim did have a heart attack. He noted the blockage, scattered small scarring in the area, and a build up a fluid in the lungs. Both Drs. Virani and Spitz testified that morphine overdose will also cause fluid to build-up in the lungs, but Dr. Spitz testified that he would have expected the lungs to weigh twice as much as they did if the death was the result of the morphine.

---

[2]All the experts essentially agreed that the range of  lethality depends heavily on the particular person taking the morphine. A person will quickly develop a tolerance for morphine that allows him or her to take larger amounts without ill effect. Also, pain is an antagonist to morphine. A person not experiencing pain will be more sensitive to the drug than someone who is experiencing pain.

The defense also presented expert testimony regarding the cause and origin of the fire. The defense experts opined that the fire investigators and analysts had made mistakes. They explained that burn pattern and fire debris analysis is not always reliable. One expert testified that the Michigan State Police expert misinterpreted the data in a sample and that there were not any heavy petroleum products found in the sample. He explained that the expert had misinterpreted polyethylene or decomposing plastic for a heavy petroleum product. The defense expert also found no meaningful evidence that an ignitable liquid was used to start the fire. Another defense expert compared burn patterns from known test cases in which an ignitable liquid was not used with the patterns present in the Balfour house. He opined that the fire indeed started in the bedroom, but it was impossible to determine its cause.

Following closing arguments and instructions, the jury found Petitioner guilty of the charged offenses. Petitioner was sentenced as indicated above.

Petitioner then filed a claim of appeal in the Michigan Court of Appeals, which raised the following claims:

> I. One of the essential elements of murder is that the defendant must cause the victim's death. The evidence proved that the victim Balfour died from a heart attack, not from morphine intoxication. The evidence also showed that David Balfour did not cause her heart attack. Since the victim Balfour died of natural causes, the evidence is insufficient to support Balfour's murder conviction.

> II. The trial court abused its discretion when it admitted the gruesome autopsy photograph of Beverly Balfour's badly charred body. This picture was not relevant to any fact at issue because she did not die from the burns and the photo did not show the side of her body that could have shown a flammable liquid burn pattern. This photograph prejudiced the small town jury against Balfour to the point they decided the case on sympathy and not on the evidence.

-8-

III. The prosecutor introduced evidence of a second fire to prove Balfour's modus operandi. But the prosecutor did not demonstrate the foundational requirements that Balfour set the second fire and that it had a special quality or circumstance. Nor did the prosecutor provide adequate notice that he was prosecuting Balfour for the second fire. The admission of the second fire evidence was error.

IV. The trial court admitted summaries of conversations with Beverly Balfour where she said that David Balfour was going to kill her. Most of the so-called statements were reports or narratives, which did not demonstrate that the statements had sufficient indicia of reliability to be admitted under MRE 803(24) or MRE 804b(6). Therefore the trial court abused its discretion when it admitted these statements.

V. A prosecutor's duty is to seek justice, not merely to convict. Improper promises and giving witnesses information to testify to at trial is beyond the proper prosecutorial misconduct. Michael Smith, the central snitch witness, indicated he was given information to testify to at trial and that he was promised an illegal sentence. A remand is necessary to develop a record to support these allegations of prosecutorial misconduct.

The Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *People v. Balfour*, No. 242630 (Mich. Ct. App. October 28, 2003). Petitioner subsequently filed an application for leave to appeal with the Michigan Supreme Court which raised the same claims. The Michigan Supreme Court denied the application by form order. *People v. Balfour*, No. 125033 ( Mich. Sup. Ct. March 30, 2004).

Petitioner then filed his original habeas petition in this Court on June 3, 2005. Because some of the Petitioner's claims were not exhausted, the Court granted Petitioner a stay to file a motion for relief from judgment in state court to present his unexhausted claims to the state courts.

Petitioner returned to the trial court and filed a motion for relief from judgment that presented the following claims:

I. After his appeal was filed, Balfour learned that the prosecutors knowingly allowed a biased juror to serve on the jury. He also learned that the

prosecutors forced Gregory Van Camp to testify to their version of the facts and knowingly presented perjured testimony of Michael Smith. Is an evidentiary hearing necessary to develop a factual record to support these allegations of prosecutorial misconduct that denied Balfour due process of law?

II. The trial court violated Balfour's Sixth Amendment right to Confrontation when it admitted Beverly Balfour's untruthful statements that she made to gain leverage in the divorce proceedings. The statements were unconfronted, there is no evidence that Balfour intended to prevent her from testifying, and they do not fall within any hearsay exception.

The trial court denied the motion in an opinion dated August 5, 2009. Petitioner appealed this decision to the Michigan Court of Appeals, but his application for leave to appeal was denied "for failure to establish entitlement to relief under M.C.R. 6.508(D)." *People v. Balfour*, No. 297724 (Mich. Ct. App. August 11, 2010). Petitioner applied for leave to appeal this decision in the Michigan Supreme Court, but that court also denied relief under M.C.R. 6.508(D). *People v. Balfour*, No. 141820 (Mich. Sup. Ct. March 8, 2011). Petitioner then moved to reopen his habeas petition, which this Court granted in an order dated July 14, 2011.

## II. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)(*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997)); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must

-11-

ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring in judgment)). In order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

### III. Analysis

### A. Prosecutorial Misconduct

Petitioner first contends that prosecutorial misconduct rendered his trial fundamentally unfair. He asserts that the prosecutors allowed a potentially biased juror to sit on the jury without informing the trial court, intimidated a witness to testify in accordance with statements he made to police, and fed information to a jail-house informant to question

Petitioner.

The first two allegations were first raised in the state courts in Petitioner's motion for relief from the judgment, which requested an evidentiary hearing. The third allegation was raised for the first time during trial, and the trial court found the claim to be without merit. It was then presented on direct appeal, and summarily denied by the Michigan Court of Appeals. Petitioner claims that because the existing record is insufficient to adjudicate the claims, and because he requested but was denied a hearing in the state courts, he is entitled to a hearing on these claims in this Court.

### 1. Evidentiary Hearing

Petitioner is not entitled to a hearing in this Court on his claims. The trial court denied relief with respect to his first allegation on the merits, and the third claim was summarily denied on the merits by the Michigan Court of Appeals during Petitioner's direct appeal.

The Court may not hold a hearing on Petitioner's first and third allegations because those claims were adjudicated on the merits in the state courts. In *Cullen v. Pinholster*, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), the Supreme Court held that where a habeas claim has been decided on its merits in state court, a federal court's review under 28 U.S.C. section 2254(d)(1)—whether the state court determination was contrary to or an unreasonable application of established federal law—must be confined to the record that was before the state court. 131 S. Ct. at 1398.  The *Pinholster* Court specifically found that the federal district court should not have held an evidentiary hearing regarding Pinholster's claims of ineffective assistance of counsel until after the Court determined that the petition survived review under Section 2254(d)(1). *Id.* at 1398.  This Court must decide these

claims based on the existing record.

The Court need not hold a hearing on Petitioner's second allegation, which was denied on procedural grounds by the trial court, because the claim can be decided based on the existing record. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

### 2. Biased Juror

Petitioner first alleges that the prosecutors committed misconduct when they knew that one of the prospective jurors was the victim of a domestic assault case, but they failed to inform the court or defense counsel about the juror's potential bias. Petitioner also asserts that the prosecutors had a duty to inform the court when the juror failed to answer questions about her contact with law enforcement or knowing the attorneys involved during the jury selection proceeding. The claim has merit and entitles Petitioner to relief.

The United States Supreme Court has made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); see also *Darden v. Wainwright*, 477 U.S. 168, 181(1986) (citing *Donnelly*); *Parker v. Matthews*, 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (confirming that *Donnelly/Darden* is the proper standard).

It is improper for a prosecutor to fail to disclose information that suggests a juror may be biased. *Smith v. Phillips*, 455 U.S. 209, 218-21 (1982). Under established Supreme Court law, however, "the remedy for allegations of juror partiality is a hearing in which the

-14-

defendant has the opportunity to prove actual bias." *Id.* at 215.

In *Smith,* the Court considered a case in which the prosecutor failed to disclose information indicating the possible bias of a juror. During the state court trial, a juror submitted an application for employment as a major felony investigator in the district attorney's office.  This fact was made known during trial to the prosecuting attorneys.  After the jury returned a guilty verdict, defense counsel learned of the application and moved to set aside the verdict. The trial court held a hearing, questioned the juror, found as fact that the juror had not been biased or prejudiced, and denied the motion. *Id.* at 211-14.

On subsequent federal habeas review, the district court, while finding insufficient evidence to demonstrate that the juror was actually biased, concluded that it could impute bias to the juror sufficient to warrant a new trial. The court of appeals affirmed.

The Supreme Court reversed, rejecting the "imputed bias" theory. The Court based its holding on its longstanding rule that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215 (emphasis added). The Court stated:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case.

*Id.* at 217 (footnote omitted). The Court stated that "if in the federal system a post-trial hearing such as that conducted here is sufficient to decide allegations of juror partiality, the

-15-

Due Process Clause of the Fourteenth Amendment cannot possibly require more of a state system." *Id.* at 218.

Clearly established Supreme Court law holds that where information comes to light suggesting juror partiality, due process requires a hearing to be held in  which the defendant has the opportunity to prove actual bias. *Id.* at 215-16. A court must  "determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial, in a hearing with all interested parties permitted to participate."  *Remmer v. United States*, 347 U.S. 227, 230 (1954).

Petitioner attached several affidavits to his petition. These documents were apparently also included with his motion for relief from judgment filed in the state trial court. The first affidavit is by Deborah Smith Lawson. Lawson states that she is an investigative reporter who has investigated allegations of misconduct within the Lapeer County Prosecutor's Office.  Lawson says that a little over a year before Petitioner's trial, Julie Gunning, one of the jurors who deliberated in Petitioner's case, was the complaining witness in an assault with intent to murder prosecution against her husband, Robin Gunning.[3] The affidavit alleges that Prosecutor Byron Konschuh handled the sentencing in the Gunning case. The affidavit also claims that the assistant prosecutor who tried the Gunning case, Eric Reinhardt, told Lawson that both prosecutors from Petitioner's case "were in and out of the courtroom during the [Gunning] trial."  Perhaps more significantly, the affidavit alleges that Reinhardt told Lawson that assistant prosecutor Timothy Turkelson

---

[3]Other documents attached to the petition seem to indicate that the charge against Robing Gunning was assault with intent to do great bodily harm less than murder.  See Petitioner's Exhibit C.

-16-

personally knew Julie Gunning because he used her daughter to babysit his kids. Lawson also states that Turkelson told Reinhardt that Julie Gunning was in the jury pool for Petitioner's trial.

Petitioner's current counsel, Rosemary A. Gordon, attached her own affidavit to the petition. The affidavit alleges:

> That during the David Balfour trial, Erik Reinholdt went into the courtroom during jury selection and noticed Julie Gunning in the jury box. That he asked both Byron Konschuh and Timothy Turkelson about Julie Gunning being on the jury and whether they had disclosed the fact to defense counsel and the court that they knew her. They told him that they weren't going to tell anyone because she would be helpful to them and if the defense counsels were too stupid to ask, they weren't going to tell.

Gordon Affidavit, para. 5-7.

Gordon also alleges that she spoke with Robin Gunning, and he confirmed that Julie Gunning went to the prosecutor's office on several occassions and stayed for significant periods of time because he drove her there. The affidavit claims that Robin Gunning also told Gordon that Julie Gunning said she had powerful friends in the prosecutor's office.

No affidavits or statements from Reinhardt or Julie Gunning were attached to the petition or any of the state court pleadings.

Respondent attached the cover pages from the transcripts of the Gunning trial to his answer. The cover pages to the transcripts indicate that the Gunning's sentencing hearing was held on April 16, 2002. (Respondent's Answer, Appendix 4).[4] The cover page to the sentencing transcript indicates that Reinhardt appeared for the prosecution. April 16, 2002,

---

[4]In contrast, Petitioner's Exhibit D, a copy of the prosecutor's docket, indicates that the sentencing hearing was held April 16, 2001. Assuming Gunning did not walk down the hall to attend Petitioner's jury selection proceeding immediately after attending her husband's sentencing, the April 16, 2001, date is probably the correct one.

is also the date the jury selection was held in Petitioner's trial in front of a different judge sitting in the same court.

If Petitioner's untested allegations are true, then the prosecutors who tried Petitioner's case knew of Gunning's potential for bias and knew that she gave incomplete answers at the jury selection proceeding, but they failed to disclose it. At the start of jury selection, the trial court informed the entire pool of potential jurors to listen to the questions put to the initial slate of fourteen prospective jurors. During the questioning of this initial slate, among many other matters, the court asked the potential jurors whether they had any involvement with the criminal justice system.   After additional questioning, two were removed for cause. Two new potential jurors, including Julie Gunning, were selected as replacements. The trial court first asked the other new juror a series of questions, including whether he had any experience in the criminal justice system. The court then turned to Gunning, and it asked her whether she had heard the early questions asked by the court and attorneys. Gunning responded: "Yes. The only one is I know you because you did my divorce."  T I, 136.  She also denied that she knew any of the attorneys or recognized any of the names mentioned.

At this point, if Petitioner's allegations are true, the trial prosecutors knew that Gunning did have experience with the criminal justice system.  In fact, the same office had handled the prosecution of her husband for assaulting her, and the prosecutor who handled that prior case was in the courtroom and informed Petitioner's prosecutors of her presence on the jury panel. Simply put, if the affidavits are accurate (and the state courts saw fit not to test whether they were) the prosecutors knew that Gunning did have quite a bit of experience with the criminal justice system.  Their failure to correct her incomplete answers

prevented defense counsel and the court from exploring any potential bias she may have had in favor of the prosecution.

But this was not the end of the matter.  Later in the selection process, another replacement juror said that one of the early questions applied to her because she knew the prosecutors when she tried to get a warrant against her husband. This relevant exchange did not prompt any response from Gunning, nor did it act as a cue for the prosecutors to bring out Gunning's similar circumstance with the prosecutor's office. It is clear, though, that Gunning was still paying attention because she later mentioned that she also knew one of the named parties involved in the case, her pharmacist who was listed as a witness. Gunning's silence as to her contacts with the criminal justice system and familiarity with the prosecutors suggests bad faith and bias. The trial court and defense counsel had a right to be informed of these matters.

Despite these proffers by Petitioner suggesting the prosecutors in Petitioner's case knew of Gunning's potential bias, and despite the record that suggests Gunning was not forthcoming during jury selection, the trial court denied the claim without holding a hearing as required by *Smith*. Instead the trial court denied the claim as follows:

> In the case at bar, Defendant has failed to submit any evidence to this Court that a juror number 8, Mrs. Gunning was not impartial and actually biased in favor of the People. Julie Gunning swore the oath of a juror as required by the Michigan Court Rules after being selected to the jury. She swore that she would justly decide the questions submitted to her, she would render a true verdict, and she would render her verdict only on the evidence introduced and in accordance with the instructions of the Court. "Some showing must be made that the misconduct affirmatively prejudiced the defendant's right to a trial before an impartial jury." *People v. Miller*, 482 Mich. 540, 561 (2008); *People v. Daoust*, 228 Mich. App. 1, 9 (1998), *overruled in part by Miller, supra; People v. Fetterly*, 229 Mich. App. 511, 544-545 (1998). Mere assertion is not enough. *Id.*

-19-

Opinion Denying Motion for Relief from Judgment, p. 2.[5]

Given the information Petitioner presented to the state court, its decision to deny the claim without holding an evidentiary hearing to allow Petitioner to develop the facts and establish that Gunning was actually biased ran contrary to, or involved an unreasonable application of, *Smith*. As the Court stated in *Smith,* "due process means . . . a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case." *Id.* at 217. Petitioner proffered sufficient evidence to the state trial court to raise a substantial claim that the prosecutors knew Gunning and that she was potentially biased, but the court failed to hold a hearing.

The state court's rationale that Gunning swore to be impartial is no answer.  The juror at issue in *Smith* also took such an oath, and the trial prosecutors in that case used that fact as their rationale for not informing the trial court, but the Supreme Court nevertheless found that due process required the court to hold a hearing to determine whether the jury was actually biased.

Respondent states that there is no evidence of prosecutorial misconduct because Petitioner has nothing other than hearsay to show that the prosecutors knew Gunning or knew that she might be biased. Respondent points to the fact that no affidavits were obtained from Julie Gunning or from prosecutor Reinhardt to substantiate the claim.

───────────────

[5]This is the last reasoned opinion by the state courts with respect to this claim. The Michigan appellate courts denied Petitioner relief with respect to his prosecutorial misconduct claims by citing Michigan Court Rule 6.508(D).  Under *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010), the orders of the Michigan appellate courts are unexplained.

Of course, this argument misses the point. Petitioner did not present the state trial court with an unsupported or fanciful claim of juror bias. Rather, the court records suggest that Gunning's husband indeed was prosecuted by the same prosecutor's office for a domestic assault and that the victim of the assault sat on the jury panel in Petitioner's case. Petitioner's counsel informed the state trial court that she spoke with the prosecutor in Gunning's case, and he told her that he informed Petitioner's prosecutors of Gunning's presence on the jury. Petitioner's prosecutors are said to have responded that they would not disclose what they knew about Gunning because she would be a favorable juror for them. The prospective jurors were asked if they knew any of the lawyers and if they had any involvement in the criminal justice system. Gunning did not respond to either question. Gunning's silence combined with the allegation by her husband that she said she had "powerful friends" in the prosecutor's office, and the fact that her husband was prosecuted for a similar offense by the same office, suggest that Gunning was potentially biased in favor of the prosecutor.

It is not always possible for a party to convince a reluctant witness to sign an affidavit. But it is possible for a court to compel a witness to appear in court for a hearing. So while Petitioner may not have been able to obtain a sworn statement from Gunning or Reinhardt to support his claim, it was not necessary for him to do so to adequately inform the state trial court that a potentially biased juror sat on Petitioner's jury. The information Petitioner gave the trial court in his motion for relief from judgment was sufficient to require it under *Smith* to hold a hearing to determine whether Gunning was in fact biased. Its failure to do so violated due process and ran contrary to clearly established Supreme Court law.

As stated in *Smith*, however, the remedy is not a new trial. At this point, all that is

known is that a *potentially* biased juror sat on Petitioner's jury. If, as in *Smith*, the trial court had held the requested hearing and found that Gunning was not biased, Petitioner would be entitled to no relief. If, though, it is determined that Gunning was biased, then despite the very weighty evidence of Petitioner's guilt, he would be entitled to a new trial because the presence of the biased juror constitutes a structural error requiring automatic reversal. *See Washington v. Recuenco*, 548 U.S. 212, 219, n.2 (2006) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927) (biased trial judge)). Under *Smith*, this is a determination that the trial court was and is still required to make.  Petitioner is entitled to habeas relief based on this claim conditioned on the trial court holding a hearing to determine whether juror Julie Gunning was actually biased.

### 3. Intimidation of Witness

Petitioner's second claim of prosecutorial misconduct asserts that the prosecutors chastised Gregory VanCamp for not testifying to the story they wanted him to tell and threatened to charge him with perjury.

In finding the claim barred from review, because the facts underlying the claim were known at the time of Petitioner's direct appeal, the trial court rejected the claim as follows:

> The review of the records reveals that Mr. VanCamp testified three times against the defendant; once at trial and twice during the two preliminary examinations.  The first time Mr. VanCamp testified that he was 'scared shitless' and had difficulty remembering a statement he had made to a police officer.   The next two times Mr. VanCamp testified-during a second appearance at the preliminary examination and then at trial–that he had heard the Defendant arguing with his wife, and heard him say: "before I let you divorce me, I'll kill you because you are not getting everything I worked my whole life for."

> Defendant's counsel, Mr. Reznick, was well aware of the changes in Mr. VanCamp's testimony and extensively questioned him about that. Defendant's counsel also extensively argued that the change in Mr.

VanCamp's testimony was the result of prosecutorial misconduct.

Opinion Denying Motion for Relief from Judgment, pp. 2-3.

"Government misconduct that amounts to substantial interference with a witness' free and unhampered determination to testify may be deemed a violation of due process." *United States v. Clark*, 319 F. App'x 395, 404 (6th Cir. 2009). "Such misconduct amounting to witness intimidation will not justify a new trial, however, unless the defendant demonstrates that it was not harmless." *Id.* (*citing United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007)). *See also Bank of Nova Scotia v. United States*, 487 U.S. 250, 255-56 (1988) (holding that alleged prosecutorial misconduct during grand jury proceedings, including allegations of witness intimidation, was subject to harmless error analysis); *United States v. Hasting*, 461 U.S. 499, 508-09 (1983) (rejecting automatic reversal without regard to prejudice where constitutional error occurs).

Even if it is true that the prosecutors attempted to intimidate VanCamp into testifying in accordance with his police statement, any such error was harmless. The Supreme Court has explained that in cases involving review of a state-court criminal judgment under 28 U.S.C. § 2254, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). *Fry* adopted *Brecht's* more "state-friendly standard" for cases involving collateral review of state-court decisions. *Hereford v. Warren*, 536 F.3d 523, 532-33 (6th Cir. 2008). Under *Fry*, an error is considered not harmless when "the matter is so evenly balanced that the habeas court has grave doubt as to the harmlessness of the error." *Id.* at 533; *Patterson v. Haskins*, 316 F.3d 596, 609 (6th Cir. 2003).

-23-

As noted by the trial court, defense counsel vigorously cross-examined VanCamp regarding whether the authorities had attempted to influence his testimony.  VanCamp's testimony that he heard Petitioner threaten to kill the victim was one piece of a strong multifaceted case presented against Petitioner. The evidence indicated that the victim told several people prior to the murder that she was scared that Petitioner would kill her. Petitioner made several statements to people after the fire that indicated that he was responsible for the victim's death. Petitioner's statements and conduct immediately after the fire also suggested that he had been untruthful to authorities about his actions on the morning of the fire. The location of Petitioner's gravel truck, the second fire, and the burns on Petitioner's face all pointed to foul-play.  Finally, the jury obviously chose to believe the prosecutor's expert witnesses that the victim died as the result of morphine poisoning and not a heart attack and that the fire was intentionally set, otherwise they would have acquitted Petitioner.

While VanCamp's testimony was not insignificant, it was not the centerpiece of the case built against Petitioner, and it was subjected to adequate cross-examination by defense counsel.  The Court finds that any error in the prosecutors' handling of VanCamp did not have a substantial effect on the result of Petitioner's case–he surely would have been convicted nonetheless. Petitioner is therefore not entitled to habeas relief based on this claim.

### 4. Presentation of Perjured Testimony

Petitioner next asserts that the prosecutors falsely presented the testimony of Michael Smith as if he were a jail-house informant who passively listened to Petitioner tell him his story and testified in exchange for nothing. In reality, Petitioner claims, the police

and prosecutors arrested Smith for an OUIL with the specific intent to put him in jail with Petitioner, his old drinking buddy, to obtain a confession. Petitioner asserts that the police fed Smith details about the murder to make his testimony more compelling.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). That is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, and it does not matter whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 270-72 (1959). To establish relief on his false testimony claim, the petitioner "must show (1) that the prosecution presented false testimony (2) that the prosecution knew was false, and (3) that was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005).

The first permutation of this claim was presented to the trial court during trial. Petitioner claimed that the prosecutor used Smith as an informant and told him what questions to ask Petitioner. The trial court held a mid-trial evidentiary hearing on the claim. The assistant prosecutor who had contact with Smith and the officers involved all testified at the hearing and were subject to cross-examination by defense counsel. After the hearing, the trial court rejected the factual basis for the claim and denied relief as follows:

> The testimony shows that Michael Smith, an inmate at the Lapeer County Jail on OUIL Third charges did in fact have an interview on April 17, 2001 with Chief Assistant Prosecuting Attorney Turkelson along with Detective Sergeant Stimson; that during the course of that interview it was told to Mr. Smith that if he heard anything while he was in pod D that he could, if he wanted to, relay that information to the appropriate authorities, whoever they may be.

\*          \*          \*

The Court is satisfied that at that hearing no promises were made to Mr. Smith, that Mr. Smith was simply told that he could be a listening post and I believe, as the Court indicated last week, *Kuhlman v. Wilson*, 477 U.S. 436, indicates that the informant is not encouraged to elicit information but rather advised to act as a listening post and that's what the Court sees here.

As far as Mr. Smith asking any questions of Mr. Balfour, there is no indication that those questions were submitted to him by the police department, by the Prosecutor's Office or anyone else. It was simply he would question Mr. Balfour upon statements Mr. Balfour made to clarify what Mr. Balfour was saying. There is no indication that he ever got a list of questions, that he was ever told what to ask and nowhere at all did Mr. Smith ever indicate that he initiated any type of conversation with Mr. Balfour. It was simply conversations Mr. Balfour initiated on his own and that in fact once it was found out that Mr. Smith was an informant on June 12, 2001, he was in fact removed from that particular area and placed in confinement.

\*          \*          \*

This Court is satisfied that at best he was a listening post. He was not promised anything. He didn't get anything in return and he did not act as an agent of the Prosecutor's Office.

Tr. IX, pp. 2112-2116.

The trial court made a factual finding that the prosecutors and investigators did not make any promises to Smith, and that they did not inform him of any particular questions to ask Petitioner. A state court's factual findings are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1). A habeas petitioner may only rebut this with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

Petitioner indicates that new proof of his claim can be found in the affidavits attached to the petition, but the affidavits do not concern Smith in any way. An affidavit was attached to Petitioner's state court pleadings, however, from Anthony Fawcett. The affidavit claims that Fawcett was Smith's cellmate in prison, and that Smith complained to

him about the conduct of the prosecutors and police in Petitioner's case, and how they forced him to testify against Petitioner. Fawcett's affidavit does not constitute clear and convincing evidence showing that the trial court's factual findings were incorrect. Affidavits made by fellow inmates are viewed with suspicion. *See Milton v. Secretary, Dep't of Corr.*, 347 F. App'x 528, 531-32 (11th Cir. 2009); *Mendez v. Graham*, No. 11-CV-5492, 2012 U.S. Dist. LEXIS 179523, 2012 WL 6594456, *11-12 (E.D.N.Y. Dec. 18, 2012) (finding that fellow inmate's affidavit, executed after meeting witness in prison was unreliable). The Court notes that Smith may have had any number of motivations–including self-preservation–to explain to a fellow inmate that he was forced to snitch on another inmate.

Because Petitioner has not proffered clear and convincing evidence to overcome the trial court's factual findings regarding Smith's testimony, the claim is without merit.

**B. Sufficiency of the Evidence**

Petitioner next challenges the sufficiency of the evidence presented at his trial to sustain his first-degree murder conviction. Specifically, Petitioner asserts that there was insufficient evidence presented to show that he caused the victim's death.

"The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in

-27-

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted)(emphasis in the original).

A federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* Indeed, for a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S.Ct. 2060, 2065 (2012).

The Michigan Court of Appeals denied relief with respect to this claim during Petitioner's direct appeal as follows:

> The prosecutor theorized that defendant killed his wife with a lethal dose of morphine, then burned their marital home to cover up the murder. The prosecutor further claimed defendant attempted to defraud his insurance company both for the fire from which his wife's body was recovered (the marital home) and also for a second fire that occurred later the same day in an addition to the house defendant's wife used as a daycare center by claiming loss for items that were not present in the home. The prosecutor contended that defendant feared that his wife would take 70% of the marital assets in their pending divorce and that motivated the murder.
>
> Defendant countered that no murder occurred because his wife died before the fire of a heart attack, and that there was no arson because the cause of the first fire, the only fire that defendant was charged with starting, was undetermined. He argued critical prosecution witnesses were not credible. Defendant's theory of the case was that the fire was unexplained

-28-

and that the amount of morphine found in the victim's body was not lethal. At trial, defendant presented expert witnesses to support his theory that neither a homicide nor an arson occurred.

A claim that evidence at trial was insufficient to support a conviction presents an issue of law reviewed de novo. *People v. Herndon*, 246 Mich. App. 371, 415 (2001). We must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found all of the elements of the offense were proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319; *People v. Wolfe*, 440 Mich. 508, 515 (1992), mod 441 Mich. 1201 (1992). We are required to review the sufficiency of the evidence with deference by making all reasonable inferences and resolving credibility conflicts in favor of the jury verdict. *People v. Nowack*, 462 Mich. 392, 400 (2000); *Wolfe, supra* at 514-515.

In a criminal case, due process requires that a prosecutor introduce evidence sufficient to justify a rational factfinder in concluding that the defendant is guilty beyond a reasonable doubt. *People v. Johnson*, 460 Mich. 720, 723 (1999). The elements of first-degree murder are that defendant killed the victim and that the killing was either "willful, [*4] deliberate, and premeditated," M.C.L. 750.316(1)(a), or committed in the course of a felony enumerated in M.C.L. 750.316(1)(b), which includes arson. *People v. Bowman*, 254 Mich. App. 142, 151(2002). Here, although the prosecutor also charged defendant with arson of a dwelling house, and the victim's body was badly burned in a fire, the prosecutor only charged defendant with willful, deliberate, and premeditated first-degree murder. M.C.L. 750.316(1)(a). That is, he was not charged with murder committed in the course of a felony enumerated under M.C.L. 750.316(1)(b), which includes arson. According to defendant, he could not be convicted of murder because the victim did not die as a result of the natural and probable consequences of an unlawful act. Her death was the result of an independent intervening cause in which defendant did not participate in, and which he could not foresee. *See People v. Bowles*, 234 Mich. App. 345, 349-350 (1999), modified 461 Mich. 555 (2000), and *People v. Clark*, 171 Mich. App. 656, 659 (1988).

Defendant's argument fails because although he presented expert testimony that supported his theory that the victim died of a heart attack, the question of causation is one of fact, which the jury resolved against defendant by finding him guilty of first-degree murder. "The determination of proximate cause or of the existence of an independent intervening cause of death is an issue for the jury." *Clark, supra* at 659. See also, *Herndon, supra* at 399 n 62, and *People v. McKenzie*, 206 Mich. App. 425, 431 (1994). Moreover, a prosecutor need not negate every reasonable theory of innocence, but must only prove his own theory beyond a reasonable doubt and must do so in the face of whatever contradictory evidence the defendant

-29-

provides. *Nowack, supra* at 400, citing *People v. Konrad*, 449 Mich. 263, 273; n 6 (1995). This Court will not interfere with the jury's role in determining the weight of evidence or the credibility of witnesses. *Wolfe, supra* at 514-515; *People v. Daoust*, 228 Mich. App. 1, 17 (1998). Only the trier of fact determines what inferences can be fairly drawn from the evidence and what weight they are to be accorded. *People v. Hardiman*, 466 Mich. 417, 428 (2002).

*Balfour*, 2003 Mich. App. LEXIS 2781, *1-6.

The Michigan Court of Appeals recited the correct governing constitutional standard in discussing Petitioner's claim, and its conclusion that sufficient evidence was presented at trial to sustain Petitioner's convictions was reasonable.

Petitioner's argument, at root, asserts that his expert witnesses' testimony regarding cause of death was so far superior to that of the prosecution's, that no rational fact-finder could have found beyond a reasonable doubt that he caused the victim's death. Respondent notes that the credibility of the witnesses is beyond the scope of review, there was other evidence of Petitioner's guilt, and that the jury could easily have chosen not to believe Petitioner's "hired-guns." (Respondent's Answer, p. 2). Petitioner's so-called "hired-guns" were the Wayne County Medical Examiner and a professor from Michigan State University–hardly professional experts-for-hire that a jury might dismiss out of hand.

Given the limited standard of review, the claim is without merit. The question here is not which set of experts this Court believes had the more credible explanation for the cause of death. Rather, the question is whether the Michigan Court of Appeals' decision that sufficient evidence was presented to show that Petitioner caused the victim's death fell below the "threshold of bare rationality." *Coleman*, *supra*.

Even Dr. Spitz testified for the defense that "what we're dealing with here today is a matter of opinions based on the exact same findings."  Tr. XI, pp 2648-49. And as

-30-

Respondent correctly notes, it is the province of the fact-finder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F. 2d 675, 679 (6th Cir. 1992).  The fact remains, the prosecution's experts testified that the victim had a lethal dose of morphine in her system. The defense experts disagreed. But it did not fall below the "threshold of bare rationality" for the jury to accept the testimony of the prosecution's experts.  For example, all the experts agreed that what constitutes a lethal dose depends on the circumstances of the person taking the morphine. There is no universal lethal threshold. The Michigan State University professor noted, for example, that pain is an antagonist to morphine, and therefore the same doses of morphine would be more toxic for someone who is not in pain than someone who is in pain. Tr. XI, 2563-64. That is, there were rationales available to the jury to allow them to choose to believe that the victim had a lethal dose of morphine.

Although Petitioner would like to characterize the trial as a battle of expert witnesses that he won, a rational fact-finder might have considered the other compelling evidence of Petitioner's guilt–his threats to kill the victim, his statements after the fire and to fellow inmates, his conduct, his motive, the burns on his face, and all the other circumstantial evidence suggesting that he was responsible for the victim's death.  All this is to say that the finding that sufficient evidence was presented at trial did not fall below the "threshold of bare rationality." Petitioner is therefore not entitled to habeas relief based on this claim.

## C. Admission of Evidence

Petitioner next challenges that admission of evidence. He alleges that the admission of the victim's statements about being afraid that Petitioner would kill her violated his rights under the Confrontation Clause, the admission of evidence regarding the second fire was

-31-

improper, and that the admission of an autopsy photograph was grossly prejudicial. None of these allegations can be supported by clearly established Supreme Court law, and therefore they cannot provide a basis for granting habeas relief.

### 1. Victim's Hearsay Statements

Petitioner first challenges the admission of statements that the victim made to various people that Petitioner had threatened her and she was afraid that he would kill her. Petitioner asserts that the admission of these statements violated his right to confrontation because the victim was not available for cross-examination at trial. Petitioner claims that he is entitled to relief under both the *Ohio v. Roberts*, 448 U.S. 56 (1980), framework, and the *Crawford v. Washington*, 541 U.S. 36 (2004), framework. Neither one provides a basis for granting habeas relief.

"The Sixth Amendment guarantees to a criminal defendant the right 'to be confronted with the witnesses against him.' U.S. Const. amend. VI." *Danner v. Motley*, 448 F.3d 372, 377 (6th Cir. 2006). The Amendment applies to state court proceedings, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and it "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination," *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).

Since Petitioner's trial, the interpretation of the Confrontation Clause has undergone a radical transformation. Whereas it formerly prohibited the admission of hearsay statements lacking sufficient indicia of reliability, it now only prohibits the admission of "testimonial" hearsay. *See Crawford, supra.* Petitioner asserts that the statements at issue were both "testimonial" and unreliable.

Petitioner's reliance on *Crawford* and *Giles v. California*, 128 S.Ct. 2678 (2008),

which followed it, is misplaced. *Crawford* was decided after Petitioner's conviction became final, and it is not retroactive to cases already final after direct review. *Whorton v. Bockting*, 549 U.S. 406, 409, 416-17 (2007); *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005). Petitioner may not rely on this new line of cases to establish a Confrontation Clause violation.

If Petitioner cannot receive review under the *Crawford* framework, the question then becomes whether he is entitled to review under the *Roberts* framework, even though the Supreme Court found in *Crawford* that the old line was based on an incorrect interpretation of the Confrontation Clause. The Sixth Circuit Court of Appeals considered this question and found that a habeas applicant has no entitlement to the application of the overruled *Roberts* body of law. *See Desai v. Booker*, 538 F.3d 424, 427-28 (6th Cir. 2008).

The Sixth Circuit noted the apparent unfairness of this result, but explained that a habeas applicant in Petitioner's position is nevertheless not entitled to relief:

> Desai's final appeal is to fairness, one of the chief characteristics of which is symmetry. As he correctly points out, there is nothing symmetric about giving the State the choice of sidelining unhelpful new Supreme Court precedents when it wishes and of invoking helpful new Supreme Court precedents when it wishes. Just as the State may win a habeas case based on the law then in existence at the time of the state-court decisions, as long as those decisions reasonably applied Supreme Court precedent, Desai submits, so he should be able to win a habeas case based on equivalent grounds--that the state courts unreasonably applied then-existing Supreme Court precedent. Either all parties to a habeas dispute should have the same option, or neither should. But symmetry generally does not figure prominently in criminal law--a tradition that usually favors the individual charged with a crime. Statutory and constitutional criminal-procedure protections all run in favor of the individual, not the State. And the only thing going on here is a recognition that, once the State has satisfied all of these one-way burdens for obtaining a conviction and once a defendant has had a chance to test that conviction on direct review, there is a one-way finality interest in the other direction--one that requires the individual to show why the state courts unreasonably upheld that conviction. That may be why Desai has failed to

cite, and we have been unable to find, any federal appellate decision that has
granted the writ, whether before AEDPA or after, based on dated Supreme
Court precedent that had been overruled by the time the federal courts acted
on the application.

*Desai*, 538 F.3d at 431.

Petitioner cannot demonstrate entitlement to habeas relief based on this claim
because it is based either on an overruled body of Supreme Court law, or on new Supreme
Court law that cannot be applied retroactively to his case.

### 2. Evidence of Accelerants

Petitioner next asserts that the trial court erred in admitting evidence regarding the
second fire because Petitioner was not charged with any offense relating to it, and he had
evidence that he was at another house when the second fire was set.  The Michigan Court
of Appeals found that the evidence was nevertheless admissible under Michigan Rule of
Evidence 404(b) because of the similarity of the burn patterns in both fires.

A claimed violation of a state evidentiary rule or any other provision of state law is
not cognizable on habeas review. *See Bey v. Bagley*, 500 F 3d 514, 519 (6th Cir. 2007).
Moreover, the Supreme Court has not established that admitting "prior bad acts" or "other
acts" evidence violates due process. *See Bugh v. Mitchell*, 329 F. 3d 496, 512 (6th Cir.
2003); *see also Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003). Given the
lack of Supreme Court authority on the issue, the Michigan Court of Appeals' rejection of
Petitioner's claim was not an unreasonable application of clearly established federal law.
*See Wright v. Van Patten*, 552 U.S. 120 (2008); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

### 3. Autopsy Photograph

Petitioner next asserts that the trial court erred in allowed admission of an autopsy

photograph. The photograph in question depicted deep burning across the victim's legs. The prosecutor offered it to corroborate evidence that a flammable liquid was poured over the victim's legs. The Michigan Court of Appeals found that the trial court did not abuse its discretion in admitting it under Michigan Rule of Evidence 403.

Autopsy and crime-scene photographs are often by their nature gruesome. Nevertheless, the Sixth Circuit has approved their admission when they can be used for a proper purpose, despite their emotion-provoking quality. *Biros v. Bagley,* 422 F.3d 379, 391 (6th Cir. 2005) (concluding that state court decision affirming the admission of "three photographs depicting [the victim's] severed head, her severed head held near her torso and severed breast, and her torso with the severed head and severed breast replaced on torso," did not render a trial fundamentally unfair because the photographs refuted the petitioner's account of the victim's death); *Frazier v. Huffman*, 343 F. 3d 780, 789 (6th Cir. 2003) (denying habeas relief where multiple photographs were introduced during the coroner's testimony to show several different perspectives of the victim, and the photographs illustrated the nature of the encounter that immediately preceded the victim's death). Petitioner's trial was not rendered fundamentally unfair by the admission of the photograph in this case.

### 4. Cumulative Error

Petitioner's final assertion is that the cumulative effect of the admission of the complained of evidence rendered his trial unfair. The Sixth Circuit has consistently and explicitly held that a habeas petitioner cannot premise relief on a claim of cumulative-trial error. *See, e.g., Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (the law of the is that cumulative-error claims are not cognizable on habeas because the Supreme Court has

not spoken on this issue) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (discussing cumulated evidentiary errors)); *see also Lorraine*, 291 F.3d at 447 (same). Petitioner is not entitled to habeas relief with respect to his cumulative-error claim.

## IV. Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is **CONDITIONALLY GRANTED** on the juror bias claim.  It is hereby **ORDERED** that Petitioner be afforded an evidentiary hearing in the trial court to determine whether juror Julie Gunning was biased.  The evidentiary hearing must be held within ninety (90) days from the entry of this Order or ninety (90) days after any appellate review is final, whichever date is later.  If the hearing is not held within that time, Respondent is ordered to release Petitioner from custody.

The petition is otherwise **DENIED** as to the remaining claims.


S/Denise Page Hood                              
Denise Page Hood
United States District Judge

Dated:  April 30, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 30, 2013, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry                        
Case Manager